**Electronically Filed
Intermediate Court of Appeals
CAAP-11-0001072
24-APR-2013
09:31 AM**

NO. CAAP-11-0001072

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


ROARING LION, LLC, a Montana Limited Liability Company;
DAVID COWAN and NATHALIE COWAN; UMANG P. GUPTA and
RUTH M. GUPTA, as Trustees of the Umang and Ruth Gupta Trust
under Trust Agreement dated January 18, 2000;
and PAUOA BEACH 8 LLC, a Hawai'i Limited
Liability Company, Plaintiffs-Appellants,
v.
EXCLUSIVE RESORTS PBL1, LLC, a Delaware Limited
Liability Company; and EXCLUSIVE RESORTS PBL3, LLC
a Delaware Limited Liability Company, Defendants-Appellees
and
PAUOA BAY PROPERTIES, LLC, a Delaware Limited Liability
Company; WHITE SAND BEACH LIMITED PARTNERSHIP, a Delaware
Limited Partnership; PAUOA BEACH REALTY LLC, a Hawai'i
Limited Liability Company, JOHN DOES 1-50, Defendants

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 04-1-0332)

MEMORANDUM OPINION
(By:  Foley, Presiding J., Fujise and Ginoza, JJ.)

Plaintiffs-Appellants Roaring Lion, LLC, David Cowan, Nathalie Cowan, Umang P. Gupta, Ruth M. Gupta, and Pauoa Beach 8 LLC (Plaintiffs) appeal from the December 5, 2011 Amended Final Judgment and related orders entered in the Circuit Court of the Third Circuit[1] (circuit court).  The circuit court entered

---

[1]  The Honorable Greg K. Nakamura presided.

judgment in favor of Defendants-Appellees Exclusive Resorts PBL1, LLC (ER1) and Exclusive Resorts PBL3, LLC (ER3) (Defendants).

## I.  BACKGROUND

A.      Factual Background

        This appeal concerns the Pauoa Beach subdivision within the Mauna Lani Resort (Resort) master development[2] in the County of Hawaiʻi.  The Resort includes hotels, residences, retail operations, recreational areas, golf courses, and other uses and services.  All lots in the Pauoa Beach subdivision are subject to both the Mauna Lani Resort Association Declaration of Covenants and Restrictions (Resort Declaration) and the Pauoa Beach Declaration of Covenants, Conditions, Restrictions, and Easements (Pauoa Beach Declaration) (collectively, Project Documents).

        Pauoa Beach consists of two subdivisions with residential lots: a subdivision of oceanfront lots (Makai Subdivision) and a subdivision of non-oceanfront lots (Mauka Subdivision).  Plaintiffs own lots in the Makai Subdivision of Pauoa Beach.  In December 2003, non-party Exclusive Resorts, LLC (ER) - Defendants' parent company - purchased lots in the Mauka Subdivision.  The lots were consolidated and renamed Lot B, and ER received approval from the Mauna Lani Resort Design Committee to build eight condominium units in the form of four duplexes on Lot B.  ER assigned its purchase agreement for Lot B to its subsidiary ER1.  Upon completion of constructing residences at the Pauoa Beach lots, Defendants intended to make the residences available to members of a luxury destination club, the details of which are discussed further below.  During the litigation of the summary judgment rulings on appeal, construction of the four duplexes on Lot B was underway, and there is no evidence

_____

        [2]      A "master development" means "a real estate development that consists of more than one project, including but not limited to a planned community association subject to [Hawaiʻi Revised Statutes (HRS)] chapter 421J [(2004 Repl.)] with one or more sub-associations."  HRS § 514E-1(D) (2006 Repl.).

2

regarding actual use of Lot B by members of the destination club. However, the record indicates destination club members who stayed elsewhere in the Resort received some access to Pauoa Beach facilities.

The Resort Declaration governs the permitted uses in all subdivisions within the Resort, including Pauoa Beach, and states that all property within the Resort is subject to certain restrictive covenants running with the land. Article V lists the restrictive covenants and contains a section providing general restrictions on land use. Section 1(a)(14) states:

> (14) Except in the case of Commercial Lots, no gainful occupation, profession or trade shall be maintained on any Lot or in any structure on any Lot without the prior approval of the [Resort] Board, except that this provision shall in no way limit or restrict Declarant or Declarant's Nominees in their activities prior to the sale, leasing or other development of Lots within the Mauna Lani Resort nor prevent Owners from renting their houses, apartment units or Condominium Units.

(Emphases added.)

The Pauoa Beach Declaration states: "Developers intend to develop the Property for residential use comprised of Lots and the Association Property and, at the election of Developers, one or more Condominium Projects, and to sell or otherwise convey the Lots, Units and Association Property." The Pauoa Beach Declaration provides that if it contains a provision more restrictive than that in the Resort Declaration, the more restrictive provision controls. The Pauoa Beach Declaration contains the following use restrictions:

> § 15.4.1 Residential Use. All Lots and Units shall be used only for residential use (whether transient or permanent) and incidental activities and in compliance with the Resort Declaration and applicable law (including zoning ordinances and building codes). As provided in the Resort Declaration, no gainful occupation, profession or trade shall be maintained on any Lot or Condominium Common Elements or within any Unit without the prior approval of the Board of Directors of the Resort Association.
> . . .
>
> § 15.4.13 Timeshare Prohibited. No timeshare use or ownership plan to which Chapter 514-E, [HRS] would be

3

> applicable shall be permitted with respect to all or any
> portions of the Property.

(Emphases added.)

The deed to Lot B stated the property was expressly subject to the Project Documents' restrictive covenants, and the purchase agreement contained a use restriction provision stating: "The Lot shall at all times be occupied and used only for residential purposes in accordance with applicable laws, the Resort Declaration and the Pauoa Beach Declaration and for no other purposes."

B.       Procedural Background

On October 7, 2004, Plaintiffs filed a complaint alleging the Project Documents only allowed for residential use in Pauoa Beach and prohibited "commercial, hotel, transient or vacation rental, time-share, club activities and the like." The complaint sought a judicial declaration that the Project Documents prohibited Defendants' proposed use of Lot B and requested an order enjoining ER1 from operating a destination club within Pauoa Beach. The complaint also asserted breach of fiduciary duty by and statutory claims against the subdivision developers, Pauoa Bay Properties, LLC (PBP) and White Sand Beach L.P., and misrepresentation by the developers and their broker. On July 25, 2005, Plaintiffs filed a First Amended Complaint (FAC) adding ER3 as a defendant.

On February 24, 2005, Plaintiffs filed a motion for partial summary judgment asserting that ER1's intended use violates the Pauoa Beach Declaration's restrictive covenant against "time share use or ownership plans to which Chapter 514E, Hawai'i Revised Statutes [(2006 Repl.)] would be applicable" (Plaintiffs' HRS Chapter 514E MSJ). On March 31, 2005, PBP filed a cross-motion for partial summary judgment on all claims relating to compliance with the Project Documents' restrictions relating to residential use in Pauoa Beach (Cross-Motion). In

April 2005, ER1 joined PBP's Cross-Motion and also filed a motion for partial summary judgment on the interpretation and application of HRS Chapter 514E (ER1's HRS Chapter 514E MSJ).

On July 19, 2005, the circuit court filed its order (1) denying Plaintiffs' HRS Chapter 514E MSJ and (2) granting ER1's HRS Chapter 514E MSJ. On July 27, 2005, the circuit court filed its order granting PBP's Cross-Motion.

On December 13, 2010, Defendants filed a motion for attorneys' fees, and on May 11, 2011, the circuit court filed an order granting in part Defendants' motion for attorneys fees.

On May 17, 2007, the circuit court entered an order granting Defendants' motion for summary judgment on any remaining claims asserted in Plaintiffs' FAC. On December 5, 2011, the circuit court entered its Amended Final Judgment, which resolved all claims against all parties. Defendants filed a timely notice of appeal from the Amended Final Judgment on December 20, 2011.

On appeal, Plaintiffs contend the circuit court erred in:

(1) holding that Defendants' use would not violate the Project Documents' covenants regarding residential use in Pauoa Beach;

(2) holding that Defendants' use did not constitute a time share use plan as defined under HRS § 514E-1 and therefore did not violate the Pauoa Beach Declaration's prohibition of time share use plans; and

(3) awarding Defendants' attorneys fees.[3]

---

[3] Plaintiffs also raised as a point of error the circuit court's August 18, 2010 decision to stay certain orders regarding the enforcement of an interim settlement agreement. This argument requires us to analyze the merits of the enforcement orders at issue in a related appeal under consolidated case Nos. 30152 and CAAP-12-00000003. Given the Memorandum Opinion being filed simultaneously in the related appeal, concluding that there was no enforceable settlement agreement, the circuit court's stay order is moot.

## II. STANDARDS OF REVIEW

A.      Summary Judgment

        The standard of review for the grant or denial of a motion for summary judgment is well-settled. "Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki*, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983). "[The appellate] court reviews a circuit court's grant or denial of summary judgment de novo." *Bremer v. Weeks*, 104 Hawaiʻi 43, 51, 85 P.3d 150, 158 (2004) (quoting *Hawaiʻi Cmty. Fed. Credit Union v. Keka*, 94 Hawaiʻi 213, 221, 11 P.3d 1, 9 (2000)).

        [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom, in the light most favorable to the party opposing the motion.

        *Omerod v. Heirs of Kaheananui*, 116 Hawaiʻi 239, 254-55, 172 P.3d 983, 998-99 (2007) (citations omitted) (emphasis added).

Blaisdell v. Dep't of Public Safety, 119 Hawaiʻi 275, 282, 196 P.3d 277, 284 (2008).

B.      Award of Attorneys' Fees

        [The appellate] court reviews the trial court's grant or denial of attorneys' fees and costs under the abuse of discretion standard. *Price [v. AIG Hawaiʻi Ins. Co.]*, 107 Hawaiʻi [106,] 110, 111 P.3d [1,] 5 [(2005)].

        The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. Stated differently, an abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

        *Id.*

Enoka v. AIG Hawaii Ins. Co., Inc., 109 Hawaiʻi 537, 544, 128 P.3d 850, 857 (2006).

## III. DISCUSSION

A.  The Meaning of "Residential Use" and the Prohibition on "Gainful Occupation, Profession or Trade"

Plaintiffs presented uncontroverted evidence to the circuit court indicating Defendants provided or intended to provide a number of services and amenities in conjunction with the rental of Defendants' units.  ER's chief executive officer described ER's operations as "combin[ing] the size and elegance of a private home with the amenities of a five-star hotel."  He further stated:

> We provide complete staffing for all our locations.  This includes, at a minimum, local concierge and housekeeping. We also make available private chefs, massage therapists, and other high end service providers. In many markets, including Hawai'i, we also provide our Members with access to our fleet of automobiles.  Our current Hawai'i automobiles include Toyota Sequoia's [sic] and electric GEM cars.

The circuit court concluded Defendants' use would not violate any of the Project Documents' use restrictions.  The court noted the Project Declarations' provisions generally require all lots and units in the Pauoa Beach Subdivision be used for residential purposes only and therefore, commercial uses are prohibited at Pauoa Beach.  The court determined Defendants' rental of units would not constitute a commercial use, stating: "Article V, § 1(a)(14) of the Resort Declaration makes clear . . . that owners may rent their homes or units.  This would be considered a residential use rather than a commercial use." Consequently, the circuit court granted partial summary judgment in Defendants' favor on this issue.

"The fundamental rule in construing restrictive covenants is that the intention of the parties as shown by the covenant governs."  DeMund v. Lum, 5 Haw. App. 336, 342, 690 P.2d 1316, 1321 (1984).  In construing the covenant, "the court is not limited to dictionary definitions, but the meaning of words used is governed by the intention of the parties . . . .  The words

7

are to be taken in their ordinary and popular sense . . . unless it appears from the context that the parties intended to use them in a different sense." Id. at 342-43, 690 P.2d at 1321 (quoting 20 Am. Jur. 2d Covenants § 186 (1965)).

The restrictions' language and the surrounding circumstances support the circuit court's conclusion that short-term rentals for profit may be considered a residential use. The Pauoa Beach Declaration specifically states residential uses may be either "transient or permanent." The Pauoa Beach subdivision is located in an area zoned "resort-hotel," and the record indicates at least one other lot on the subdivision was being used as a transient vacation rental. Therefore, the mere fact an owner rents a unit, even on a short-term basis and for a profit, does not turn the unit's use from residential to commercial.[4]

Plaintiffs agree the Project Documents generally permit rentals but contend the restrictive covenants, when read in their entirety, bar owners from carrying on "commercial" activity in renting their units. We agree. Furthermore, based on the record before us of Defendants' activities and of the parties' intent as expressed by the Project Documents' language, we conclude there is a genuine issue of material fact as to whether Defendants' rental activities rise to the level of commercial activity.

---

[4] The majority of jurisdictions that have addressed the scope of the term "residential use" have also concluded the short-term rental of property may be considered a "residential use" when the occupants use the property only for ordinary residential purposes such as eating and sleeping. Slaby v. Mountain River Estates Residential Ass'n, Inc., 100 So. 3d 569, 578-79, 582 (Ala. Civ. App. 2012), cert. denied, No. 1110881 (Ala. 2012). The "residential" nature is not defeated by the transitory duration of the rental or by the owner's receipt of rental income and commercial benefit. Id. at 580-81. See also Pinehaven Planning Bd. v. Brooks, 70 P.3d 664 (Idaho 2003) (holding that restrictive covenants disallowing "commercial or industrial ventures or business of any type" from being maintained on any lot in the subdivision were not ambiguous and, "according to their plain meaning, clearly allow the rental of residential property[,]" whether short-term or long-term, because the use "does not violate the prohibition on commercial and business activity as such terms are commonly understood"); Lowden v. Bosley, 909 A.2d 261 (Md. 2005); Mullin v. Silvercreek Condo. Owners Ass'n, 195 S.W.3d 484 (Mo. App. 2006); Mason Family Trust v. DeVaney, 207 P.3d 1176 (N.M. Ct. App. 2009).

Although we are aware our courts "resolve <u>substantial</u> doubts or ambiguity in restrictive covenants against the person seeking enforcement[,]" <u>Hiner v. Hoffman</u>, 90 Hawai'i 188, 195, 977 P.2d 878, 885 (1999) (emphasis added and omitted), "[t]he fundamental rule in construing restrictive covenants is that the intention of the parties as shown by the covenant governs[.]" <u>DeMund</u>, 5 Haw. App. at 342, 690 P.2d at 1321. "[T]he rule regarding construction favoring the free use of land is not applicable . . . where the evidence of intent is clear and unrefuted." <u>Id.</u>

Here, the Project Documents' language clearly and unambiguously evince an intent to prohibit commercial activity on the Pauoa Beach lots. The Resort Declaration contemplates only two types of lots: residential and commercial. The Resort Declaration defines a "Residential Lot" as a lot used for "residential purposes" by a single family or by more than one family. A "Commercial Lot" is defined as a lot "designated for commercial purposes." The Project Documents' two provisions prohibiting the maintenance of a "gainful occupation, profession or trade" are the only general use restrictions in the Project Documents that differentiate between "commercial" and "residential" lots. Therefore, because the Project Documents contemplate only two types of lot use, and because the prohibition of "gainful occupation, profession or trade" is the only use restriction unique to residential lots, any use rising to the level of maintaining a "gainful occupation, profession or trade" constitutes a commercial use and cannot be deemed "residential" within the meaning of the Project Documents.

Our interpretation of the term "commercial" is further informed by the Resort Declaration's definition of the term "Commercial Apartment" as "a building or structure containing apartment units which are <u>owned substantially by a single common entity and rented or leased for profit</u>." (Emphasis added.).

9

Defendants note the term "Commercial Apartment" does not appear elsewhere in the Resort Declaration and appears again only in the Resort's bylaws, under the section addressing voting rights classifications. Consequently, the circuit court concluded the Resort Declaration's definition of a "Commercial Apartment" "does not relate to use restrictions on those units" but rather "is used to categorize ownership interests in order to determine voting power and assessments." Although the term may relate primarily to voting power, the definition is nevertheless relevant to our determination of the meaning intended by the parties because we must consider the entire context of the covenants. See Pelosi v. Wailea Ranch Estates, 10 Haw. App. 424, 436, 876 P.2d 1320, 1327 (1994) ("[T]he intent of the parties, as gleaned from the entire context of the covenant, governs.").

Defendants contend our analysis of a potential breach of a use restriction should focus not on the unit owners' activities but rather on the unit's occupants, who use the units for residential purposes. Our case law, however, demonstrates that we must consider the nature and character of the owner's use. In Chang v. Magbee, 45 Haw. 454, 3700 P.2d 479(1962), the Hawai'i Supreme Court concluded a convalescent home violated a restrictive covenant prohibiting, among other operations, a boarding house or hospital. Although the inhabitants used the home for residential purposes, the supreme court reached its decision in part because of the services the home's owners provided (food, lodging, laundry services, and assistance with daily activities). Id., 45 Haw. at 455, 370 P.2d at 480.

Moreover, in determining whether rental activities exceed the scope of "residential use," one factor other jurisdictions have found relevant is whether the owner provided services or conducted transactions on-site.[5] The nature and

---

[5] For example, in Applegate v. Colucci, 908 N.E.2d 1214 (Ind. Ct. App. 2009), the court analyzed restrictive covenants requiring subdivision

(continued...)

extent of such services (such as any increase in noise, traffic, or pollution; the hours of operation; and whether outside employees would be working on-site) are also relevant to whether Defendants' use constitute "incidental activities," which are permitted under the "residential use" provisions.[6] See Pauoa Beach Declaration § 15.4.1 ("All Lots and Units shall be used only for residential use (whether transient or permanent) and incidental activities[.]").

      As noted above, it is undisputed in this case that Defendants intended to provide a number of services and amenities to its renters. Because construction of Defendants' Pauoa Beach units was ongoing during the summary judgment proceedings, however, there is little in the record before us that we can use to accurately determine the impact of Defendants' intended use of its Lot B units. At oral argument, Defendants' counsel did not know whether Defendants' services and amenities would be provided at the units or off-site, and it is unclear from the record the extent to which such activities would result in increased noise, traffic, or usage of the subdivision's common facilities.

---

[5](...continued)
parcels be "used only for residential purposes" and stating: "No commercial business shall be carried on upon any parcel. . . . Nothing herein contained shall prevent the leasing or renting of property or structures for residential use[.]" Id. at 1217. The court concluded the owners' short-term rental of their cabins was allowed, but the maintenance of a rental office on the property created a question of fact as to whether covenants were violated. Id. at 1219-21. See also Slaby, 100 So.3d at 580 (specifically noting the owners rented their cabin as a residence but did not provide any services to their tenants and did not conduct any mercantile or financial transactions on-site); Yogman v. Parrott, 937 P.2d 1019, 1021 (Or. 1997) (noting the owners "provide no goods, staff, or services at the house" and "renters use their own linens, do their own cleaning, buy and prepare their own food, and take out their own garbage").

[6]     Compare Sullivans Island v. Byrum, 413 S.E.2d 325 (S.C. Ct. App. 1992) (use of part of home as a bed and breakfast was not "incidental and secondary" to residential use of property because the boarding operations "dominated the character and use of the residence") and Gregory v. State Dep't of Mental Health, Retardation & Hosps., 495 A.2d 997 (R.I. 1985) (concluding group home for six persons with disabilities was within the scope of "single-family dwelling" and "residential purposes only," noting that necessities of group homes (such as maintaining records and providing care in exchange for payment) were incidental to primary purpose of operating as family housekeeping unit, and the home would not alter the neighborhood's character and quality of life).

Based on the foregoing, we conclude that although the Project Documents expressly allow "transient" rentals, the Project Documents on the whole establish the parties' intent to limit the scale and scope of the unit owners' rental activity. We further conclude that whether Defendants' intended use rises to the level of maintaining a "gainful occupation, profession or trade" remains a genuine issue of material fact. The circuit court erred in granting partial summary judgment on the issue of whether Defendants' use violated any of the Project Documents' restrictions related to residential use.

B.        "Time Share Plan" Under HRS Chapter 514E

Upon completion of constructing residences at their Pauoa Beach lots, Defendants intended to make their residences available to members of a destination club. Defendants planned to assign their occupancy rights to Exclusive Resorts Club Management, LLC, ("Club") which operated a destination club that provided its members with access to a portfolio of vacation residences in locations around the world. Members paid a one-time membership fee of up to $375,000 and annual dues ranging from $9,500 to $30,000.

The Club's membership agreement set forth the membership's terms and conditions. Under the membership agreement, every member had the right to use Club properties for a set number of "included days" according to the member's purchased usage plan. For example, a "Silver" usage plan entitled the member to use Club properties for thirty "included days," and a "Platinum" plan entitled the member to sixty "included days." Additionally, once a member has used all of his or her "included days" for the year, the member could also purchase an unlimited number of additional days for $1,500 per night. The membership agreement further specified that a member's opportunity to occupy available Club properties was on a "first-come, first-served basis."

Plaintiffs contend Defendants' use of Lot B constitutes a time share use plan governed by HRS Chapter 514E and is therefore prohibited under the Pauoa Beach Declaration. Section 15.4.13 of the Pauoa Beach Declaration provides: "No timeshare use or ownership plan to which Chapter 514-E [sic], Hawai'i Revised Statutes would be applicable shall be permitted with respect to all or any portions of the Property."

HRS Chapter 514E regulates the sale and operation of time share plans in Hawai'i. Preliminarily, Plaintiffs contend Chapter 514E is a remedial statute and should be broadly construed to accomplish "the protective purpose and policy of the statute that time sharing and transient vacation rentals should not be permitted where the life styles of the permanent residents will be disrupted in an unreasonable manner." Reefshare, Ltd. v. Nagata, 70 Haw. 93, 100, 762 P.2d 169, 174 (1988)

The statutory language and legislative history indicate the legislature promulgated Chapter 514E to carry out two policies: the protection of consumers who purchase time share interests, and the preservation of the residential character of neighborhoods. Neither policy concern is present in this case. First, Plaintiffs undisputedly are not consumers who purchased time share interests. As for the second policy concern, the legislature chose to protect residential lifestyle by generally prohibiting time shares except "[i]n areas designated for hotel use, resort use, or transient vacation rentals, pursuant to county authority under section 46-4 [("County zoning")][.]" HRS § 514E-5 (2006 Repl.); see also Conf. Comm. Rep. No. 8-80, in 1980 Senate Journal, at 941-42. Thus, the legislature intended to authorize time shares on property that can lawfully be used for hotel purposes. As noted above, the Pauoa Beach subdivision is located in an area zoned "resort-hotel," and the Pauoa Beach Declaration permits transient rental usage of the property. Because this case's circumstances do not implicate the

legislative concerns underlying Chapter 514E, Plaintiffs' argument for a broad construction of the statute is unpersuasive.

HRS § 514E-30 (2006 Repl.) establishes the Chapter's scope and states:

> This chapter applies to the offer and sale in Hawai'i of time share interests in time share units located in Hawai'i . . . As to the offer and sale outside of Hawai'i of time share interest in a time share plan which includes time share units located in Hawai'i, this chapter . . . shall apply.

Defendants contend the Club's operations are outside the Chapter's scope because Defendants hold title to their Pauoa Beach lots in full and were not offering to sell any interests in their lots. However, HRS § 514E-1's definition of a "time share interest" does not require that purchasers receive an ownership interest. Rather, the statute defines the term broadly to mean "any interest in a time share unit or plan which entitles the owner or holder thereof to the use . . . of a time share unit[.]" HRS § 514E-1. The Club gives its members rights to temporary use of its accommodations, which is a sufficient interest to fall within the broad definition of a "time share interest."

As to whether the Club constitutes a "time share plan," HRS § 514E-1 provides the following definitions:

> §514E-1  Definitions.
>
> . . . .
>
> "Time share plan" means any plan or program in which the use, occupancy, or possession of one or more time share units circulates among various persons for less than a sixty-day period in any year, for any occupant. The term time share plan shall include both time share ownership plans and time share use plans, as follows:
>
> (1) "Time share ownership plan" means any arrangement whether by tenancy in common, sale, deed or by other means, whereby the purchaser receives an ownership interest and the right to use the property for a specific or discernible period by temporal division.
>
> (2) "Time share use plan" means any arrangement, excluding normal hotel operations, whether by membership agreement, lease, rental agreement, license, use agreement, security or other means, whereby the purchaser receives a right to use accommodations or facilities, or both, in a time share unit for a specific or discernible period by temporal division, but does not receive an ownership interest.

14

Plaintiffs did not assert at the trial level or on appeal that Defendant's use constituted a time share ownership plan. In any case, the Club's membership agreement expressly dictates that Club members do not receive "investment, equity or ownership interest or any other real property interest[.]" Therefore, we limit our analysis to whether Defendant's use falls within the definition of a "time share plan" and "time share use plan."

Because the statutory provisions set forth a number of features and characteristics that are inconsistent with the Club's operations, we conclude Defendants' use does not fall within the meaning of a time share plan. First, HRS § 514E-1 establishes that a plan or program does not constitute a "time share plan" unless the plan limits an occupant's use of the units to "a specific or discernible period by temporal division." The circuit court concluded that under the Club's plan, members were not entitled to "a specific or discernible period" of use, and we agree.

A number of provisions in Chapter 514E indicate that the phrase refers to a limitation of each purchaser's use rights to a definite or distinct duration (for example, a week), regardless of when the time period begins or ends. First, HRS § 514E-8.6 (2006 Repl.) imposes a "one-to-one use-right to use-night requirement" on all time share plans and was enacted "to prohibit overselling, or selling the right to use more weeks or nights than are available in a time share plan, and to assure the right and practical ability of each owner to use a time share unit for the maximum number of nights to which the owner is entitled." Sen. Comm. Rep. No. 582, in 1997 Senate Journal, at 1127. In order to know the number of nights to which an owner is entitled, however, each owner's right to use must be for a definite and distinct unit of time. Additionally, HRS § 514E-1's definition requires that time share units "circulate[] among

15

various persons," which suggests occupancy of the units must move through a circuit according to some schedule.

In this case, the membership rules limit each member's right to use any one location to twenty-one consecutive days, but there is no limit on the number of times the member can stay at one location. Moreover, the membership agreement expressly states Club properties are not divided into occupancy periods or intervals. Instead, Club members receive an unlimited right to use, common among other members and based on availability on a first-come, first-serve basis. In <u>All Seasons Resorts v. Dep't of Bus. Regulation</u>, 455 So. 2d 544 (Fla. Dist. Ct. App. 1984), the Florida court examined a plan similar to the Club and concluded the plan lacked specific periods of time for use by the purchaser. Consequently, the court concluded the plan was not a time-share project subject to registration under the Florida Time-Share Act. <u>Id.</u>, 455 So.2d at 548. Because the Club does not confine its members' use to "a specific or discernible period by temporal division," as this phrase is used in Chapter 514E, we conclude the Club does not fall within the definition of a time share plan.

The applicable statutory definitions further establish that a plan or program does not constitute a "time share plan" unless the plan limits its occupants' use of the units to "less than a sixty-day period in any year." The Club, however, does not place a sixty-day limit on its members' use of the properties. Members who purchase the "Platinum" usage plan receive the right to use Club properties for a full sixty days and are thus outside of the statutory definition. Members of all usage plans also have the right to use the properties for an unlimited number of additional days for a daily fee. A member who makes multiple stays at the Pauoa Beach properties could, in theory, stay for a net total of sixty days or more under the "Platinum" plan or by purchasing additional days, and the record

indicates Club members have in fact stayed at other Club properties on the mainland for greater than sixty days.

Plaintiffs claim a factual dispute exists as to whether any of Defendants' members may use a unit for more than a sixty-day period per year, because the evidence indicates no member has yet occupied a Club location in Hawaiʻi for more than sixty days. We disagree. Statutory qualification as a "time share plan" turns on whether the Club's plan provides the right to occupy and use its properties for sixty or more days, and not on an after-the-fact determination of whether a member has in fact availed himself or herself of this usage right.

Chapter 514E sets forth further requirements that flesh out the definition of a time share plan, such as the establishment of an owners' association, the mandate for an annual budget, the power to levy assessments, and the provision of voting rights to purchasers. HRS §§ 514E-29, 514E-6.5 (2006 Repl.). The Club, however, only allows temporary use and does not offer property ownership, so the Club does not provide for an owners' association. Members do not participate in the Club's governance and have no voting rights. Other than the initial membership fee and annual fee, members cannot be charged special or other assessments to cover maintenance or operational costs. Furthermore, HRS § 514E-19 (2006 Repl.) requires all funds to be held in escrow until the sale is closed and the time share interest is conveyed to the purchaser "free and clear of any blanket liens." However, the Club's members purchase their interests through a membership contract; the transaction is not a real estate transaction that is required to be free and clear of liens. Lastly, as noted above, HRS § 514E-8.6's one-to-one use-right to use-night requirement is incompatible with the Club's concept of offering its members an unlimited right to use.

The cardinal rule of statutory construction is that we must ascertain and give effect to the intention of the

17

legislature, and we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. Haole v. State, 111 Haw. 144, 149, 140 P.3d 377, 382 (2006). "The legislative intent may be determined from a consideration of the entire act, its nature, its object, and the consequences that would result from construing it one way or the other." Tataii v. Cronin, 119 Hawai'i 337, 339, 198 P.3d 124, 126 (2008) (internal quotation marks omitted). Furthermore, "the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." State v. Arceo, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996) (internal quotation marks, citation, and brackets omitted).

This is not a case of Defendants attempting to escape the ambit of HRS Chapter 514E by simply failing to provide for items which the statute requires. Rather, construing HRS Chapter 514E as a whole and looking to the substance of its regulatory requirements, it is apparent the legislature did not contemplate regulating programs such as the Club under HRS Chapter 514E. As discussed above, because several of Chapter 514E's requirements are incompatible with the Club's operations, the statute would have to be applied in a piecemeal manner, and major provisions would have to be waived or modified. We presume the legislature did not intend this result.

Therefore, we conclude the circuit court did not err in concluding that Defendants' Club operations were not a violation of the Pauoa Beach Declaration's prohibition on time share plans.

C.      Attorneys' Fees

In light of our decision to vacate the circuit court's grant of summary judgment, we must also vacate the circuit court's award of attorneys' fees on the grounds that neither party is the prevailing party for the purposes of awarding fees under HRS § 607-14 (Supp. 2012).

18

## IV.   CONCLUSION

Based on the foregoing, we vacate the

(1) July 27, 2005 "Order Granting Defendant Pauoa Bay Properties, LLC's Cross-Motion, Filed on March 31, 2005, for Partial Summary Judgment Against Plaintiff Roaring Lion, LLC, David Cowan and Nathalie Cowan, Umang P. Gupta and Ruth M. Gupta, As Trustees of the Umang and Ruth Gupta Trust Under Agreement Dated January 28, 2000, and Pauoa Beach 8 LLC on Residential Use and on Compliance with Article V, Sec. 1(A)(14) of the Mauna Lani Resort Declaration and Defendant Exclusive Resorts PBL1, LLC's Joinder, Filed on April 4, 2005";

2) May 11, 2011 "Order Granting in Part Defendants Exclusive Resorts PBL1, LLC and Exclusive Resorts PBL3, LLC's Motion for Attorneys' Fees, Filed on December 13, 2010"; and

(3) December 5, 2011 "Amended Final Judgment," all entered in the Circuit Court of the Third Circuit.  We remand this case for further proceedings.

DATED:  Honolulu, Hawai'i, April 24, 2013.

Margery S. Bronster
Rex Y. Fujichaku
(Jae B. Park with them on the briefs)
(Bronster Hoshibata)
for Plaintiffs-Appellants.

Robert G. Klein
R. John Seibert
Lisa W. Cataldo
(McCorriston Miller Mukai MacKinnon)
for Defendants-Appellees.

Presiding Judge

Associate Judge

Associate Judge